# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

-vs-               Case No.  6:04-mc-128-Orl-KRS

MATEUS JOSÉ CARDOSO,

      Defendant.

_____

## ORDER

This cause came on for consideration on the complaint filed by the United States

requesting this Court to certify an extradition request for Mateus José Cardoso, a Brazilian citizen,

on behalf of the Federative Republic of Brazil (Brazil), pursuant to the Treaty of Extradition

Between the United States of America and the United States of Brazil, January 13, 1961, T.I.A.S.

No. 5691, 15 U.S.T. 2093, 1964 WL 70284 (the Treaty).[1]  Doc. No. 1.  Cardoso filed a motion

requesting the Court to exclude all offenses not expressly enumerated in the Treaty and/or dismiss

the complaint in its entirety, doc. no. 28, to which the United States has responded, doc. no. 31.  I

have jurisdiction over this matter pursuant to 18 U.S.C. § 3184 and Middle District of Florida

Local Rule 6.01(c)(9).

## I.  PROCEDURAL HISTORY.

On October 1, 1998, an indictment charging Cardoso with violating several provisions of

the Código Penal (Brazilian Penal Code) was submitted in the Criminal Court for the District of

_____

[1] The United States of Brazil is now known as the Federative Republic of Brazil.

Jaciara, State of Mato Grosso, Brazil.[2]  *See* Frost Documents; Indictment dated October 1, 1998,

signed by Adriano Augusto Streicher de Souza, District Attorney (Indictment).  Under Brazilian

law, this document serves as the principal charging instrument.  *See* Henshaw Documents; Official

Letter No. 041/05, dated January 10, 2005, signed by Deputy Judge Júlio César Molina Monteiro,

Esq.  In the Indictment, Cardoso was accused of violating the following provisions of the Brazilian

Penal Code:  Article 121 ¶ 2, I, II and V (aggravated homicide) combined with Article 288

(forming a gang of more than three persons for the purpose of committing crimes); Article 171, V

(larceny) combined with Article 14, II (attempt); Article 211 (destruction, theft, or hiding of a dead

body); Article 304 (making use of counterfeit or altered documents); and Article 29 (conspiracy).

Shortly thereafter, a Warrant of Preventive Detention was issued for Cardoso in Brazil.  *See* Frost

Documents; Warrant of Preventive Detention No. 094/98, dated October 1, 1998 (Warrant of

Preventive Detention).

Sometime prior to March 2001, Brazilian authorities learned that Cardoso was residing in

Orlando, Florida.  Thereafter, the Brazilian Embassy contacted the United States Department of

State and requested the United States to obtain a provisional arrest warrant for Cardoso for

purposes of extradition.  *See* Collums Documents; Request No. 146/04, dated August 30, 2004;

Request No. 073, dated March 23, 2001.  Thereafter, the United States filed a criminal complaint

---

[2] The United States has submitted several documents certified by Consul Generals of the United States, Gregory Frost and Simon Henshaw, in support of its extradition request.  In addition, the United States has submitted several documents along with the Declaration of Haley D. Collums, Attorney Advisor, Office of the Legal Advisor, Department of State, United States of America. Cardoso does not challenge the authenticity of these documents.  I will refer to these documents throughout the course of this Order as follows: Frost Documents; Henshaw Documents; and Collums Documents, with citation to the specific document at issue thereafter.

seeking Cardoso's extradition and the issuance of a provisional arrest warrant.  A provisional

arrest warrant was issued, after which Cardoso was arrested in Ocoee, Florida, on November 3,

2004.  Cardoso appeared before the Court on November 5, 2004, at which time he was ordered to

be detained pending further proceedings.

Subsequently, the United States presented evidence from Brazil to support extradition of

Cardoso.  On December 15, 2004, I held a hearing on the extradition complaint pursuant to 18

U.S.C. § 3184.  Doc. Nos. 32, 34.

Following the hearing, the United States and Cardoso both submitted supplemental

briefing and documentation.  Doc. Nos. 40, 43, 44.

## II.    ALLEGATIONS

The Brazilian authorities allege in the indictment and a Brazilian Judge, Dr. Pedro Pereira

Campos Filho, found probable cause to believe as follows:  Cardoso conspired with several other

individuals, namely, Dorgival Gomes dos Santos (Dorgival), Cardoso's business partner; Dorgivan

Gomes dos Santos (Dorgivan), Dorgival's brother; Neuza Bernardes da Silva Santos (Silva

Santos), Dorgival's ex-wife; and Carlos Pereira da Silva (Silva) to murder Lázaro Leon Pires

(Pires) "in order that [Dorgival] should be taken as 'dead' in [Pires'] place, in order to commit an

insurance fraud against insurers[.]"  Henshaw Documents; Indictment.  To effectuate the crimes,

Dorgival obtained a false identification document in the name of Davi Fernandes de Matos.  He

also took out a number of life insurance policies on his (Dorvigal's) life with Silva Santos and

Cardoso as the beneficiaries.  Some of the policies had a double premium if Dorgival died

accidentally.

Dorvigal then persuaded Pires to accompany him on a business trip.  During the trip, Dorvigal simulated an automobile accident.  Dorgival then struck Pires on the back of his neck with a stone resulting in his death.  Thereafter, while posing as Davi Fernandes de Motos, Dorgival informed the local authorities that the body in the car was the body of Dorgival.  Thereafter, Dorgival contacted his accomplices and informed them of what had transpired.

Cardoso and Dorgivan then traveled to Jaciara and identified Pires' body as being that of Dorgival.  Pires, who at the time was thought to be Dorgival, was buried in a cemetery in Anápolis, Brazil.  Thereafter, Cardoso was tipped off that the authorities planned to exhume the body pursuant to an investigation surrounding Dorgival's alleged death.  Consequently, Cardoso and Silva paid a grave-digger, Antônio Rosa de Jesus, to remove Pires' body from the grave, thereby enabling Silva and others to disappear with the body.  Pires' body was subsequently recovered and identified by his relatives.

Following Pires' death, Cardoso and Silva Santos attempted to collect on the insurance policies on behalf of themselves and their accomplices, by submitting fraudulent documents to various insurance companies.  The Brazilian authorities allege that Cardoso and Silva Santos succeeded in collecting 151.000,00 Brazilian Reais based on Dorgival's faked death.

## III.     TREATY.

The Treaty at issue in this case between the United States and Brazil was signed on January 13, 1961, and entered into force on December 17, 1964.  15 U.S.T. 2093.[3]  It remains in full force and effect.  18 U.S.C. § 3181; *see also* Collums Documents; Decl. of Haley D. Collums.

## IV.     STANDARD OF REVIEW.

"An extradition treaty creates in a foreign government the right to demand and obtain extradition of an accused criminal. . . . Absent a treaty, the federal government lacks the authority to turn the accused over to the foreign government."  *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1360 (S.D. Fla. 1999) (citation omitted).

When a foreign government requests extradition of a fugitive pursuant to a treaty with the United States, the Court must determine whether: (1) criminal charges are pending in the requesting state; (2) the offenses for which extradition is sought are included in the treaty as "extraditable offenses"; and (3) probable cause exists to believe that the offenses charged were committed and that the person before the Court committed them.  18 U.S.C. § 3184; *see also Fernandez-Morris*, 99 F. Supp. 2d at 1360-01.

The inquiry will vary depending on the language of the particular treaty at issue. "[Extradition treaties] either list the offenses for which extradition shall be granted or designate a formula by which to determine extraditable offenses."  *United States v. Herbage*, 850 F.2d 1463, 1465 (11th Cir. 1988) (internal quotation marks and citation omitted); *see also* M. CHERIF BASSIOUNI, INTERNATIONAL EXTRADITION: UNITED STATES LAW AND PRACTICE 473-74 (4th ed.

---

[3] An Additional Protocol to the Treaty was signed on June 18, 1962.  The Additional Protocol was also entered into force on December 17, 1964.  15 U.S.T. 2093.

2002) (BASSIOUNI, INTERNATIONAL EXTRADITION).  If the treaty specifically enumerates the

offenses for which extradition may be sought, the Court must first determine whether the offenses

charged are included in the treaty.  BASSIOUNI, INTERNATIONAL EXTRADITION at 473-74.

In addition, most treaties contain a dual criminality requirement.  *Herbage*, 850 F.2d at

1465.  "In short, an individual will be extradited under a treaty containing a [dual] criminality

provision only when his actions constitute an offense in both the requesting and requested states."

*Id*.  Acts are considered criminal in the United States if they would be unlawful under federal

statutes, the law of the state where the accused is found, or by a preponderance of the states.

*Wright v. Henkel*, 190 U.S. 40, 61 (1903).

"'[T]he requesting state, which secures the surrender of a person, can prosecute that person

only for the offense[s] for which he or she was surrendered by the requested state or else must

allow that person an opportunity to leave the prosecuting state to which he or she had been

surrendered.'"  *United States v. Lehder-Rivas*, 955 F.2d 1510, 1519-20 (11th Cir. 1992) (quoting

*Herbage*, 850 F.2d at 1465).  This requirement is often referred to as the "specialty principle."

The standard federal courts are required to apply when interpreting the provisions of an

extradition treaty is well settled:

> In choosing between conflicting interpretations of a treaty obligation, a narrow and
> restricted construction is to be avoided as not consonant with the principles deemed
> controlling in the interpretation of international agreements.  Considerations which
> should govern the diplomatic relations between nations, and the good faith of
> treaties, as well require that their obligations should be liberally construed so as to
> effect the apparent intention of the parties to secure equality and reciprocity
> between them.  *For that reason if a treaty fairly admits of two constructions, one
> restricting the rights which may be claimed under it, and the other enlarging it, the
> more liberal construction is to be preferred.*

*Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933) (emphasis added).

The Federal Rules of Criminal Procedure and the Federal Rules of Evidence are expressly inapplicable to extradition proceedings. Fed. R. Crim. P. 1(a)(5); Fed. R. Evid. 1101(d)(3). Thus, hearsay and otherwise excludable evidence is admissible. *United States v. Peterka*, 307 F. Supp. 2d 1344, 1349 (M.D. Fla. 2003). If properly certified, "[d]epositions, warrants or other papers or copies thereof" offered by the requesting state in support of its extradition request must be accepted and admitted as evidence. 18 U.S.C. § 3190. In addition, "[a] fugitive's right to present evidence at the hearing on extradition is severely limited. He or she may only present evidence that explains rather than contradicts the demanding country's proof." *Fernandez-Morris*, 99 F. Supp. 2d at 1366.

Once a court determines that a fugitive is extraditable, the final decision to surrender the fugitive rests with the Secretary of State. 18 U.S.C. § 3186.

## V.     ANALYSIS.

### A.     *Conflict Concerning Brazilian Charging Documents.*

Cardoso argues that the complaint filed by the United States must be dismissed because it alleges that he committed the crimes of "aggravated homicide; murder conspiracy; insurance fraud; attempted insurance fraud; theft and hiding of a dead body; conspiracy; and the use of fraudulent documents in the commission of a fraud[.]" Doc. No. 1, at 1. It appears that in the complaint the United States attempted to frame the crimes charged in the Indictment using terminology that a prosecutor in the United States would have used had the crimes been committed in this country. The terminology used by the United States in the complaint will not be considered by the Court as an attempt to alter the charges against Cardoso. Rather, I will determine whether extradition is appropriate in this case based on the charges alleged in the Indictment. *Cf. Herbage*,

850 F.2d at 1465-66 (holding that analogizing violations under United States law to British law and consequent determination by British magistrate that conduct charged would be a violation of British law did not violate the principle of specialty).

B.   *Charges Pending in Brazil*.

There is no dispute that criminal charges are pending against Cardoso in Brazil.

C.   *Extraditable Nature of the Offenses*.

    1.   <u>Enumerated Offenses</u>.

The Treaty in this case specifically enumerates the offenses for which extradition may be sought.  The extraditable offenses enumerated in the Treaty are set forth in Article II, which provides, in relevant part, as follows:

    Persons shall be delivered up according to the provisions of the present Treaty for prosecution when they have been charged with, or to undergo sentence when they have been convicted of, any of the following crimes or offenses:

1.  Murder (including crimes designated as parricide, poisoning, and infanticide, when provided for as separate crimes); manslaughter when voluntary.

. . .

12.  Forgery or the utterance of forged papers.

. . .

17.  Larceny.

18.  Obtaining money, valuable securities or other property by false pretenses, or by threats of injury.

. . .

33.  The attempt to commit any of the above crimes or offenses, when such attempt is made a separate offense by the laws of the Contracting States.

34.  Participation in any of the above crimes or offenses.

I will review each charge in the Indictment to determine whether it falls within one of the enumerated extraditable offenses.

### Aggravated Homicide Combined With Forming a Gang

The offense of aggravated homicide falls within the definition of murder, which is one of the crimes enumerated in the Treaty.  Article II, No. 1.

The charge of aggravated homicide is combined with the charge of forming a gang of more than three persons for the purpose of committing crimes.  The crime of forming a gang is not specifically enumerated in the Treaty.  Thus, this offense must fall under the "catch-all" provision set forth in Article II, No. 34, in order to qualify as an extraditable crime.

Pursuant to Article II, No. 34 "[p]articipation in any of the above crimes or offenses" constitutes an extraditable offense.  Consistent with the principle that treaties are to be liberally construed in favor of extradition, I find that it is reasonable to infer that Article II, No. 34 was intended to cover the offense of forming a gang of more than three persons for the purpose of committing crimes.  This offense implies, at a minimum, some degree of participation in a plan or scheme to commit a crime, such as aggravated homicide, an offense expressly covered by the Treaty.

### Larceny Combined With Attempt

Larceny is specifically listed as an extraditable offense under Article II, No. 17.  In the Indictment, the charge of larceny is combined with Article 14, II (attempt).  Attempt is also an extraditable offense under Article II, No. 33,  "when such attempt is made a separate offense by the laws

of the Contracting States." Brazilian law recognizes the crime of attempt. Braz. C.P. art. 14, II. United States jurisprudence also recognizes the crime of attempted larceny. *See, e.g.,* 50 Am. Jur. 2d *Larceny* § 56 (2004).

### Destruction, Theft, or Hiding of a Dead Body

Article II of the Treaty does not include the crime of destruction, theft, or hiding of a dead body. The United States argues that this crime falls under the Treaty provision for larceny. Under the jurisprudence of the United States, it does not appear that this offense would fall under the general category of larceny. *See generally* 52B C.J.S. *Larceny* § 7 (2004) ("Stealing the body of a dead person does not constitute larceny."). In addition, the United States, on behalf of Brazil, offers no legal authority to support its contention that this crime falls under the category of larceny. Therefore, I find that this offense is not one of the extraditable offenses enumerated in the Treaty.

### Using Fraudulent Documents

I find that the offense of using fraudulent documents falls under the ambit of Article II, Nos. 12 (forgery or the utterance of forged papers) and 18 (obtaining money, valuable securities or other property by false pretenses, or by threats of injury).

### Conspiracy

The crime of conspiracy is not specifically enumerated in the Treaty. Thus, this offense, like the charge of forming a gang, must fall under the "catch-all" provision set forth in Article II, No. 34, in order to qualify as an extraditable crime. Consistent with the principle that treaties are to be liberally construed in favor of extradition, I find that it is reasonable to infer that Article II, No. 34 was intended to cover the crime of conspiracy as it applies to those offenses enumerated in the Treaty.

2.    <u>Dual Criminality</u>.

The Treaty mandates that the offenses for which extradition is sought must be punishable by "a possible penalty of deprivation of liberty for a period of more than one year" under the laws of the requesting state and the requested state, thereby creating a requirement of dual criminality.  *See* 15 U.S.T. 2093 (Article III).

"Dual criminality refers to the characterization of the relator's criminal conduct insofar as it constitutes an offense under the laws of the respective states. . . . [I]t is in effect a reciprocity requirement which is intended to ensure each of the respective states that they . . . can rely on corresponding treatment, and no state shall use its processes to surrender a person for conduct which it does not characterize as criminal."  *United States v. Gallo-Chamorro*, 48 F.3d 502, 507 (11th Cir. 1995).  The United States Supreme Court has described the requirement of dual criminality as follows: "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions."  *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

*Aggravated Homicide Combined With Forming a Gang*

Both Brazil and the United States recognize the crime of aggravated homicide.  *See* Fla. Stat. §§ 782.04(1) (murder in the first degree, which is a capital felony), 921.141(5) (aggravating circumstances); Braz. C.P. art. 121 ¶ 2, I, II and V (aggravated homicide).  In addition, this offense is punishable by a possible penalty of deprivation of liberty for a period of more than one year in both jurisdictions.  Flat. Stat. §§ 782.04(1), 775.082(1); Braz. C.P. art. 121, ¶ 2.

Because Cardoso is not alleged to have been present when Pires was killed, I must also determine whether Brazil and the United States recognize the concept of accomplice liability under an aiding and abetting theory and/or conspirator liability with respect to the charge of aggravated homicide.  Deputy Judge Monteiro states that under Brazilian law, "[w]hoever, in any way, aids and abets [the commission of] a crime is subject to the penalties set forth for it, to the extent of their culpability."  Henshaw Documents; Official Letter No. 03/2005/GAB, dated January 5, 2005; *see also* Braz. C.P. art. 288 (conspiracy); Letter No. 12 from the Embassy of the Federative Republic of Brazil, dated January 21, 2005 (stating that "under Brazilian law, a person who aids and/or abets a crime is criminally liable as a principle depending on the degree of his culpability.").  "The Court will not analyze or second guess a requesting country's interpretation of its own laws. . . . We are . . . not expected to become experts in the laws of foreign nations."  *Polo v. Horgan*, 828 F. Supp 961, 963 (S.D. Fla. 1993) (internal quotation marks omitted).  The extent of Cardoso' culpability, if any, is for Brazil to resolve.

Florida state law also recognizes the concept of accomplice liability under an aiding and abetting theory.  *See* Fla. Stat. § 777.011 (principal in the first degree).  Specifically, Fla. Stat. § 777.011 provides, in relevant part, as follows:

> Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels . . . such offense to be committed, and such offense is committed . . . is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.

In addition, it is well established under Florida law that "[a] defendant who was not present during the commission of the murder may be convicted of murder in the first-degree if premeditation is shown."  *State v. Aguiar*, 418 So. 2d 245, 246 (Fla. 1982); *see also Barfield v.*

*State*, 402 So. 2d 377, 382 (Fla. 1981) (affirming first-degree murder conviction of middle man who was not present at the killing in murder for hire insurance fraud scheme).  Moreover, Florida law also recognizes the concept of conspirator liability.  *See Martinez v. State*, 413 So. 2d 429, 430 (Fla. 3rd Dist. Ct. App. 1982) (citing *Pinkerton v. United States*, 328 U.S. 640 (1946)).[4]  Thus, if Cardoso aided and abetted and/or conspired with Dorgival to kill Pires for purposes of carrying out an insurance fraud scheme, as alleged, he could be charged with murder in the first degree under Florida law.

Both Brazil and the United States also criminalize the act of forming a gang for the purpose of committing crimes.  Braz. C.P. art. 288; Fla. Stat. § 777.04(3) (conspiracy).  Although Florida law only requires the participation of two individuals to form a criminal conspiracy, whereas the offense of forming a gang under Brazilian law requires the participation of three or more individuals, it is not necessary that the crimes have the same name or elements in both countries. *Collins*, 259 U.S. at 312.  In addition, this offense is punishable by a possible penalty of deprivation of liberty for a period of more than one year in both Brazil and the United States.  Braz. C.P. art. 288; Fla. Stat. § 777.04(4)(b).[5]  Thus, I find that the alleged conduct giving rising to the charge of aggravated homicide combined with forming a gang satisfies the dual criminality requirement.

---

[4] "In *Pinkerton*, the Supreme Court held that 'a party to a conspiracy may be held responsible for a substantive offense committed by a coconspirator in furtherance of a conspiracy, even if that party does not participate in or have any knowledge of the substantive offense.'" *United States v. Gobert*, 139 F.3d 436, 439 n.22 (5th Cir. 1998) (quoting *United States v. Jensen*, 41 F.3d 946, 955-56 (5th Cir. 1994)).

[5] Under Florida law, if the offense conspired to is a capital felony, the offense of criminal conspiracy is punishable as a felony in the first degree.  Fla. Stat. § 777.04(4)(b).

*Larceny Combined With Attempt*

_____Both Brazil and the United States recognize the crime of larceny in some form or another. *See* Braz. C.P. art. 171; Fla. Stat. §§ 812.014 (theft), 817.234 (insurance fraud).[6]  In addition, both Brazil and the United States recognize the crime of attempted larceny.  *See* Braz. C.P. art. 14, II; 50 Am. Jur. 2d *Larceny* § 56 (2004).  The conduct underlying the charge of larceny combined with attempt is punishable by a possible penalty of deprivation of liberty for a period of more than one year in both jurisdictions.  Braz. C.P. art. 171, V combined with art. 14, II; Fla. Stat. §§ 812.014, 817.234.  Thus, I find that the requirement of dual criminality has been satisfied as to this charge.

*Using Fraudulent Documents*

_____Both Brazil and the United States recognize the crime of using fraudulent documents.  *See* Braz. C.P. art. 304; Fla. Stat. § 831.02 (uttering forged instruments).  In addition, the conduct underlying this offense is punishable by a possible penalty of deprivation of liberty for a period of more than one year in both Brazil and the United States.  *See* Braz. C.P. art. 304; Fla. Stat. § 831.02.  Thus, I find that the requirement of dual criminality has been satisfied as to this charge.

*Conspiracy*

Both Brazil and the United States recognize the crime of conspiracy.  Braz. C.P. art. 288; Fla. Stat. § 777.04(3).  This offense is punishable by a possible penalty of deprivation of liberty for a period of more than one year in both Brazil and the United States.  Fla. Stat. § 777.04(4).  Accordingly, I find that the requirement of dual criminality has been satisfied as to this charge.

---

[6] Larceny is generally defined as "[t]he unlawful taking and carrying away of someone else's personal property with the intent to deprive the possessor of it permanently."  BLACK'S LAW DICTIONARY 885 (7th ed. 1999).

D.    *Probable Cause.*

I must now determine whether probable cause exists to justify Cardoso's commitment for the offenses he is alleged to have committed.  This requirement stems from 18 U.S.C. § 3184, which provides, in relevant part as follows:

> If [following a] hearing, [the magistrate judge] deems the evidence sufficient to sustain the charge[s] under the provisions of the proper treaty or convention, . . . he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

This language has been consistently interpreted as requiring a finding a probable cause that a defendant subject to extradition committed each offense for which he is charged.  *See Jimenez v. Aristeguieta*, 311 F.2d 547, 562 (5th Cir. 1962) ("[I]t must be remembered that the extradition magistrate merely determines probable cause, making an inquiry like that of a committing magistrate and no more."); *accord Horgan*, 828 F. Supp. at 965 ("To certify an extradition warrant, a magistrate [must] find probable cause that 'the evidence [is] sufficient to sustain the charge.'") (quoting 18 U.S.C. § 3184) (alteration in original).[7]

---

[7] In addition, Article I of the Treaty provides, in relevant part, as follows:

> Each Contracting State agrees, under the conditions established by the present Treaty and each in accordance with the legal formalities in force in its own country, to deliver up, reciprocally, persons found in its territory who have been charged with or convicted of any of the crimes or offenses specified in Article II of the present Treaty and committed within the territorial jurisdiction of the other, . . . *provided that such surrender shall take place only upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his commitment for*

In the extradition context, probable cause is measured by the federal standard used in preliminary proceedings. *Fernandez-Morris*, 99 F. Supp. 2d at 1365. "Probable cause is established when the evidence presented supports a reasonable belief that a fugitive committed the charged offenses." *Peterka*, 307 F. Supp. 2d at 1349. "It is not th[e] Court's duty to determine whether evidence is sufficient to justify a conviction, but rather, to determine if the evidence is sufficient to hold the accused." *Fernandez-Morris*, 99 F. Supp. 2d at 1365.

The United States submitted a copy of an insurance policy Dorgival took out on his life several months prior to Pires' death. Silva Santos (Dorgival's wife at the time) and Cardoso are named as beneficiaries. Henshaw Documents; BNC Insurance Company Policy. The United States also submitted a copy of an insurance policy Dorgival took out on his life three months prior to Pires' death, in which Silva Santos is named as the sole beneficiary. This policy provided for a double premium if Dorgival suffered an accidental death. Henshaw Documents; Bamerindus Insurance Company Policy.

In addition, the United States submitted statements made by Dorgivan and Silva Santos to Brazilian authorities. Specifically, Dorgivan stated that he attended Dorgival's feigned wake. Dorgivan noted that the coffin was obscured by a glass cover that "made it impossible to see the face of the corps[e] inside the coffin." *See* Henshaw Documents; Statement of Dorgivan, Interrogatory Proceeding Number 1569/98, dated April 24, 2000, at pg. 26. Dorgivan further stated that several of his relatives indicated that they wanted to see Dorgival's corpse but that Cardoso "did

_____

*trial if the crime or offense had been there committed.*

15 U.S.T. 2093 (emphasis added). Thus, the Treaty also contemplates a probable cause determination as a prerequisite to extradition.

not allow it." *Id*. Dorgivan stated that Cardoso insisted that he had seen Dorgival's corpse and that Cardoso told his family that they "should keep Dorgival's image as a live, strong and healthy person and not dead, all broken as he effectively was." *Id*.

Dorgivan told the Brazilian authorities that Cardoso eventually "confessed that the accident ha[d] been forged and it did not occur[ ], and that Dorgival was alive[.]" *Id*. at 28. Dorgivan further stated that in June or July of 1998, he accompanied Cardoso to the cemetery where Dorgival was purportedly buried and assisted Cardoso in removing the corpse from the cemetery, after which they transported the corpse to a hut. Dorgivan explained that he and Cardoso then reburied the corpse and covered it with cement. *Id*. at 29-30.

Silva Santos stated that Cardoso accompanied her to the banks where the false insurance claims were submitted and that Cardoso "himself took care of everything." Henshaw Documents; Statement of Silva Santos, Interrogatory Proceeding Number 1569/98, dated May 9, 2001, at pg. 32. Silva Santos stated that with Cardoso's assistance, she succeeded in collecting 151.000,00 Brazilian Reais based on Dorgival's faked death.

I find that Dorgival's and Silva Santos' statements, along with the documents submitted by the United States in support of its extradition request, including the insurance policies Dorgival took out on his life, are sufficient to establish probable cause to believe that Cardoso committed the offenses of aggravated homicide combined with forming a gang, larceny combined with attempt, making using of fraudulent documents, and conspiracy.

In summary, after reviewing the evidence submitted by the United States in support of its extradition request, I find that probable cause exists to believe that Cardoso committed the following offenses in violation of the Brazilian Penal Code as charged in the indictment: (1) Article

121 ¶ 2, I, II and V (aggravated homicide) combined with Article 288 (forming a gang of more than

three persons for the purpose of committing crimes); (2) Article 171, V (larceny) combined with

Article 14, II (attempt); (3) Article 304 (making use of counterfeit or altered documents); and (4)

Article 29 (conspiracy).

## VI.    CONCLUSION.

Accordingly, it is hereby **ORDERED** as follows:

1.    Cardoso's Motion to Exclude All Specifically Alleged Criminal Offenses Against

Mateus Cardoso in Extradition Complaint Which Are Not Covered by Article II of

the Extradition Treaty Between Brazil and the United States of America and/or in the

Alternative Dismiss the Complaint for Extradition (Doc. No. 28) is **GRANTED** in

part and **DENIED** in part.  The charge of destruction, theft, or hiding of a dead body

(Braz. C.P. Article 211) is hereby **EXCLUDED** from the extradition certification.

2.    The request for certification (Doc. No. 1) is **GRANTED** as to the following charges:

Article 121 ¶ 2, I, II and V (aggravated homicide) combined with Article 288

(forming a gang of more than three persons for the purpose of committing crimes);

Article 171, V (larceny) combined with Article 14, II (attempt); Article 304 (making

use of counterfeit or altered documents); and Article 29 (conspiracy).

3.    The United States shall submit a proposed final order within eleven (11) days from

the date of this Order so that this matter may be certified to the Secretary of State of

the United States of America, together with all formal extradition documents

received into evidence, a certified copy of all testimony and evidence taken at the

hearing and all memoranda of law filed on the issue of extradition, and all orders of

the Court.

**DONE** and **ORDERED** in Orlando, Florida on this 10th day of May, 2005.

*Karla R. Spaulding*
_____
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

United States Marshal
United States Attorney
Counsel for Defendant